# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT ASHLAND

CIVIL ACTION NO. 10-103-DLB

JAMES McKIE                                                              PETITIONER


v.                        <u>MEMORANDUM OPINION AND ORDER</u>


DAWN RENEE JUDE                                                        RESPONDENT

\*     \*     \*     \*     \*

On October 5, 2010, Petitioner James McKie filed a petition for return of his minor child JHM[1] (Doc. # 1), pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, *opened for signature*, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 51 Fed. Reg. 10,493, 10,498 (app. B) (the "Hague Convention") and the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq.* Petitioner alleges that his son JHM is being wrongfully retained in the United States by his mother, Respondent Dawn Renee Jude, and seeks his return to Canada.

Presently before the Court is McKie's Petition for Return. (Doc. # 1). The Court convened an evidentiary hearing on December 9, 2010, at which the pending petition was addressed. The Court heard testimony from Respondent Jude, who was present, and from Petitioner McKie via video conference from Canada. Petitioner was represented by Greg Mitchell, and his testimony was sworn by Canadian Barrister Kersti Kass; Respondent was represented by Mary Going. The parties having supplemented the record with additional

---

[1]To protect the identity of the child, pursuant to Federal Rule of Civil Procedure 5.2, the Court refers to Respondent and Petitioner's minor child as JHM.

exhibits and briefing subsequent to the evidentiary hearing, the matter is ripe for review. For the reasons set forth below, and because JHM's habitual residence is the United States, McKie's Petition for Return is **dismissed**.

## I. FINDINGS OF FACT

This case presents a unique set of facts. Petitioner is a citizen of Canada and Respondent is a citizen of the United States. The two met in the fall of 2005 in Charlottetown on Prince Edward Island, Canada. Respondent was in Canada on a valid student visa,[2] obtaining her undergraduate degree from the University of Prince Edward. (Tr. 98).[3] Although Jude disputes that she was ever engaged to McKie, it is undisputed that the two never married. In March 2008, Jude informed McKie that she was pregnant; their son JHM was born in Canada on October 3, 2008, and is a citizen of both the United States and Canada. (Tr. 63, 142).

After her first ultrasound, Jude's pregnancy was deemed high risk. (Tr. 79). She was suffering from an obstetric complication known as placenta previa. (Doc. # 32, Ex. 7). Her doctor required that she stop working and attending class.[4] Ultimately, she was placed on bed rest and admitted to the hospital from September 17 through October 3, 2008, when Jude had an emergency Caesarean section and JHM was delivered early. (Tr. 81). JHM spent the next fifty-six days in the neonatal intensive care unit at Queen Elizabeth Hospital on Prince Edward Island; Jude roomed at the hospital to nurse and care for JHM during

---

[2]According to her testimony, Jude's student visa in Canada expired in June or July 2010. (Tr. 126).

[3]All transcript citations refer to the hearing transcript prepared after the Court's December 9, 2010 evidentiary hearing by Official Court Reporter Joan Averdick.

[4]Jude worked at the university police department part-time while she attended the University of Prince Edward. (Tr. 98).

that time.  Once discharged, JHM and Jude resided with McKie at his house in Charlottetown for approximately two and a half weeks before leaving on a trip to the United States to visit Jude's family in Kentucky.  (Tr. 101).

Before his birth, JHM was diagnosed with severe bilateral clubfeet, a congenital abnormality that in JHM's case required early treatment to prevent the need for later reconstructive surgery.  As a Canadian citizen, JHM received medical care in Canada and is still eligible for such care.  (Tr. 100).  While in the neonatal ICU, Dr. Stewart Campbell–one of the hospital physicians–implemented the initial treatment for JHM's condition acknowledging, though, that he had never dealt with a case of clubfeet.  (Tr. 85). Dr. Campbell's casting regimen was unsuccessful.  (Doc. # 32, Ex. 7).  He attempted to cast JHM several times, but each time JHM slipped out of the casts and developed severe blisters and sores as a result.  (Tr. 85).  Given Dr. Campbell's inability to effectively treat JHM's condition, the couple began researching alternative options for JHM's  treatment. Queen Elizabeth Hospital referred Jude and McKie to Dr. Lahey at IWK Children's Hospital in Halifax, Nova Scotia.  (Tr. 146).

The family made a trip to see Dr. Lahey the week after JHM and Jude were discharged from the hospital.  (Tr. 36-37).  Dr. Lahey advocated surgical treatment to correct JHM's bilateral clubfeet; however, Jude was reluctant to consent to invasive surgery on her infant son.  She instead favored the Ponseti method for clubfoot correction, which–at least in its initial stages–did not require surgery.  The method was developed based on the principle that an infant's joints, bones, and tendons will yield to gentle manipulation through the casting process.  (Doc. # 32, Ex. 4).  Jude learned of the Ponseti method through independent research in her pursuit to find a sustainable and effective treatment for JHM.

(Tr. 85). Ponseti was a treatment method she and McKie discussed even before JHM's birth. (Tr. 67). Both McKie and Jude testified that Dr. Lahey opposed the Ponseti technique and regarded it as junk science. (Tr. 105). He referred to the Ponseti technique as "cult like" and accorded its effectiveness little weight. (Tr. 105). Unsatisfied with Dr. Lahey's recommended surgical treatment, Jude looked elsewhere for viable treatment options for her son's condition. She contacted Dr. Vishwas Talwalkar at Shriner's Hospital in Lexington, Kentucky, who specializes in the Ponseti method for clubfoot correction, and scheduled an appointment to meet with him on December 23, 2008. (Hearing, Ex. 4).

On December 12, 2008, Jude and JHM traveled to Louisa, Kentucky, to visit with Jude's family for the Christmas holiday and to seek possible medical treatment for JHM. (Doc. # 32, Ex. 1). JHM was approximately ten weeks old. Jude originally planned to visit her family for three months, to which McKie consented. (Tr. 50-52). Prior to her trip, however, she and McKie decided she would seek further medical advice and/or treatment in Kentucky for JHM's bilateral clubfeet condition as evidenced by her November 2008 email to Dr. Talwalkar. (Petitioner's Hearing, Ex. 4). McKie testified that he was aware and consented to Jude seeking treatment in Kentucky prior to her departure from Canada. (Tr. 71).

Jude traveled to Louisa, Kentucky using a one-way ticket and met with Dr. Talwalkar for their scheduled December 23, 2008 consultation. (Tr. 86). After this appointment, JHM began receiving treatment under his direct care. (Tr. 103). McKie consented to JHM's first treatment at Shriner's in Lexington, which occurred on January 19, 2009, about three weeks after JHM and Jude arrived in the United States. (Tr. 104). The treatment consisted of a seven-week casting regimen after which JHM went "into brace and bars" and was

4

monitored for weeks thereafter to avoid the development of pressure sores and blisters. (Tr. 104-05). The intensive nature of JHM's treatment was evident and clearly brought Jude and JHM's stay in Kentucky well past the original but tentative March 2009 departure date.[5] McKie agreed to the treatment "as the wait list was much shorter in Kentucky than in Canada and I felt it would be in [JHM's] best interest." (McKie Affidavit; Doc. # 1, Ex. B). Dr. Talwalkar has "been treating [JHM] over the past years," since he arrived in Kentucky in December 2008. (Tr. 103). Most recently, JHM had surgery at Shriner's Hospital in Lexington on December 8, 2010, for which he is now currently undergoing post-surgery rehabilitation. (Tr. 93).

According to Jude, on two separate occasions she offered to bring JHM to visit McKie, but he refused always explaining that there was too much to do and that no one would be available to watch him. (Tr. 90). One such occasion occurred in March 2009 when Jude returned to Canada for two weeks to pack her belongings and move out of her apartment after the electricity had been shut off and her landlord was threatening to evict. (Tr. 96). Jude testified that upon moving out she gave all of her furniture to a friend of McKie and, further, communicated to McKie he could do whatever he like with the rest. (Tr. 91, 97). Jude's Canadian benefits for JHM terminated in March 2009 once she no longer maintained a Canadian residence. (Tr. 101).

---

[5]McKie testified that he signed a travel consent to allow Jude and JHM to travel to Canada from December 2008 through March 2009. (Tr. 15). Jude disputes that a travel consent was ever signed, and McKie was unable to produce a copy of the consent agreement. McKie's co-worker, however, signed an affidavit that he witnessed McKie sign the consent agreement, which showed a return date of March 2009. (Petitioner's Hearing, Ex. 1). The Court finds it unnecessary to make a credibility finding relative to the travel consent form. Even if signed and witnessed, McKie extended the scope of his consent beyond March 2009 once he agreed to allow Dr. Talwalkar to treat JHM's clubfeet.

In October 2009, Jude and McKie's relationship broke down irreconcilably. (Tr. 52-53). Jude, frustrated that she was expected to bear the entirety of the financial burden to raise and care for JHM, had an argument with McKie via the social networking site Facebook. (Tr. 107-08). Jude expressed her displeasure over McKie's inattentiveness to JHM's birthday as well as the previous Christmas holiday. She was upset that McKie did not send cards or gifts for their son and with his overall lack of assistance. McKie emailed apologizing and explained that he was still grieving his father's February death. A few weeks thereafter on October 24, 2009, he sent money to Jude's mother instructing that she take her daughter out for her birthday. (Tr. 108). Jude emailed McKie that she was going to use the money to buy JHM the birthday gift he should have bought for his son. After this contact, Jude did not hear from McKie again until she was served with the pending Petition for Return. (Doc. # 1).

Sometime between October and December 2009, JHM began exhibiting developmental problems, which specialists later assessed as signs of early autism. (Tr. 92, 112-13). To no avail, Jude attempted to make contact with McKie via email and telephone from November 2009 to April 2010 to relay information related to JHM's developing disability. (Tr. 122-23, 138-40). She attempted to contact not only McKie, but McKie's family members because JHM was "starting to have problems," and she felt it necessary to discuss the issue. (Tr. 92). Despite her repeated efforts to contact him, Jude never heard back from McKie after their brief contact in October 2009. (Tr. 109).

Jude and JHM have lived with her mother in Louisa, Kentucky, until very recently, when the two moved to their own apartment. (Tr. 96). Jude has a job working in the Catholic Diocese of Lexington's office in Louisa, Kentucky. (Tr. 135). Other than a visit to

a friend in Massachusetts thirteen years ago, McKie has not been to the United States and does not possess a valid U.S. passport. (Tr. 32, 40). JHM is two years and three months old and has been living in the United States continuously for over two years.

## II. CONCLUSIONS OF LAW

### A. The Hague Convention

The Hague Convention on the Civil Aspects of International Child Abduction is a multilateral treaty adopted by signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention" and further aims to deter abduction across international borders as a parental self-help remedy. *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting the Convention's preamble). Accordingly, the stated objectives of the Hague Convention are twofold: (1) "to secure the prompt return of children wrongfully removed or retained in any Contracting State" and (2) "to ensure that rights of custody and of access under the law of the Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. Both Canada and the United States are signatory nations to the Convention. In the United States, the Hague Convention has been implemented by Congress through the International Child Abduction Remedies Act, 42 U.S.C. § 11603 *et seq.*

Under ICARA , federal district courts have concurrent jurisdiction with state courts to determine "rights under the Convention [but] not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4), 11603(a). In other words, the Convention allows a federal district court to consider the merits of the abduction claim–whether removal or retention was wrongful–but prohibits consideration of the underlying custody dispute.

7

*Friedrich v. Friedrich*, 983 F.2d 1396, 1399 (6th Cir. 1993) . The Court's inquiry, then, is "*whether* a child should be returned to a country for custody proceedings and not *what* the outcome of those proceedings should be." *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004) (citing Hague Convention, art. 19). As the Sixth Circuit observed in *Friedrich*, "'wrongful' removal is a legal term strictly defined in the Convention" that "does not require an ad hoc determination or a balancing of the equities." 983 F.2d at 1400. Article 3 of the Convention provides in relevant part:

> The removal or retention of a child is to be considered wrongful where -
>
> a)   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The Convention operates as a procedural mechanism for courts to uniformly decide the proper forum for a custody determination, rather than allowing litigants to impermissibly use international abduction as a means of obtaining the most sympathetic forum.

It is the petitioner who bears the burden of proving by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning [Hague] Convention." 42 U.S.C. § 11603(e)(1)(A). "A petitioner cannot claim that the removal or retention of a child is wrongful under the Hague Convention unless the child to whom the petition relates is habitually resident in a State signatory to the Convention and has been removed to or retained in a *different State*." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006) (quoting *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005)) (quotations omitted). Thus, "[d]etermination of a child's habitual residence immediately

before the alleged wrongful removal or retention is ... a threshold question in deciding a case under the Hague Convention." *Karkkainen*, 445 F.3d at 287 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 222 (3d Cir. 1995)).

To establish a prima facie case for return, a petitioner must demonstrate: (1) the child was habitually residing in one country and has been removed or retained in a different country; (2) the retention was in breach of the petitioner's custody rights under the law of the country of habitual residence, and (3) the petitioner was exercising those rights at the time of the child's wrongful removal or retention under Article 3. 42 U.S.C. § 11603(e)(1); *see also Nicolson v. Pappalardo*, 605 F.3d 100, 103 (1st Cir. 2010).

After a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent who may assert several affirmative defenses that, if proven, could prevent return of the child to the country of habitual residence. *Stevens v. Stevens*, 499 F. Supp. 2d 891, 895 (E.D. Mich. 2007). Inquiry into the sufficiency of an affirmative defense becomes necessary only after a petitioner has established a prima facie case of wrongful removal or retention. If applicable, the Convention's "affirmative defenses are narrowly construed to effectuate the purposes of the Hague Convention and, even where a defense applies, the court has discretion to order the child's return." *Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 549 (E.D. Pa. 2010).

To succeed on an affirmative defense, the respondent must establish one of the following: (1) by clear and convincing evidence there is a grave risk that return of the child would expose him to physical or psychological harm. Hague Convention, art. 13b, 42 U.S.C. § 11603(e)(2)(A); (2) by clear and convincing evidence return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection

of human rights and fundamental freedoms."  Hague Convention, art. 20, 42 U.S.C. §
11603(e)(2)(A); (3) by a preponderance of the evidence the proceeding was commenced
more than one year after the wrongful removal or retention and the child has become
settled in his new environment.  Hague Convention, art. 12, 42 U.S.C. §11603(e)(2)(B); or
(4) by a preponderance of the evidence the petitioner was not actually exercising custody
rights at the time of removal or retention, or had consented to or subsequently acquiesced
in the removal or retention.  Hague Convention, art. 13, 42 U.S.C. § 11603(e)(2)(B). *See*
*Friedrich*, 983 F.2d at 1401.

**B.    Petitioner McKie's Prima Facie Case for Return**

In this case, McKie must demonstrate that (1) JHM was a habitual resident of
Canada immediately before the alleged wrongful retention in the United States; (2) the
retention was in breach of the his custody rights under Canadian law, and (3) he was
exercising those rights at the time of JHM's alleged wrongful retention under Article 3.  42
U.S.C. § 11603(e)(1); *see also Nicolson*, 605 F.3d at 103.  To determine whether McKie
has met his burden, the Court must first answer the following: (1) when did the alleged
wrongful retention occur?; and (2) immediately preceding the retention, in which country
was JHM habitually resident?  *Karkkainen*, 445 F.3d at 287.

**1.    The date of wrongful retention of JHM**

The date of the alleged wrongful retention is used to fix the time period available for
assessing what country is properly the child's habitual residence.  Hague Convention, art.
3; *see also Jenkins v. Jenkins*, 569 F.3d 549, 556-57 (6th Cir. 2009); *Feder*, 63 F.3d at 222.
Determining the date of wrongful retention often proves more difficult than determining the

date of wrongful removal for one obvious reason: wrongful retention, in many instances, cannot easily be reduced to a discrete moment in time.  Wrongful retention refers to the act of keeping the child in a country without consent of the person who was actually exercising custody.  *Feder*, 63 F.3d at 220 n.4.  In the case of wrongful retention, such as here, courts look to the last date upon which it is undisputed that the child was present in the new country with both parents' permission.  *Karkkainen*, 445 F.3d at 290.  In other words, to determine the date of wrongful retention courts will look to the date where the non-abducting parent was truly on notice that the abducting parent was not going to return with the child.  *Blanc v. Morgan*, 721 F. Supp. 2d 749, 762 (W.D. Tenn. 2010).

Here, JHM–at just over two months old–left Canada with the consent of his father for a Christmas visit with the newborn's maternal grandparents.  Sometime thereafter, McKie claims Jude's visit to the United States exceeded the scope of his initial consent.  (Doc. # 1, Ex. B).  McKie testified that he originally agreed to a three-month Christmas visit from December 2008 through March 2009.  (Tr. 50-52).  However, he testified further, and the evidence confirms, that he extended the scope of that consent to allow JHM to obtain necessary medical treatment for his clubfeet.  (Tr. 104).  Almost as soon as he arrived in Kentucky to visit with his grandparents, JHM was seen by Dr. Talwalkar at Shriner's Hospital in Lexington.  (Tr. 103).  With McKie's consent, Dr. Talwalkar scheduled JHM's first Ponseti treatment for January 19, 2009, which consisted of a seven-week casting regimen that included weeks of follow-up treatment.  (Tr. 104).  Referring to JHM's treatment in the United States, McKie testified "I didn't see the need to immediately bring him back to Canada and continue up here."  (Tr. 74).

It is clear that JHM was in the United States with both parents' permission through March 2009. (Tr. 52). Indeed, McKie conceded that he "verbally okayed everything" concerning JHM's treatment in March 2009. (Tr. 52). Moreover, McKie confirmed that it was not until October 10, 2009, when he realized that Jude had no intention of returning to Canada with JHM; it was then that he set out to retain an attorney. (Tr. 52, 107-108). Thus, prior to October 10, 2009, JHM was present in the United States with both parents' permission. The date of wrongful retention is October 10, 2009: the date on which McKie was finally on notice that Jude would not be returning to Canada with JHM.

At the hearing, counsel for Petitioner argued that although the date of JHM's wrongful retention occurred on October 10, 2009, the Court should look only to JHM's experience prior to his date of *removal* from Canada to determine habitual residence. Counsel argued the date of wrongful retention "related back" to the date of removal, and, therefore, it is only proper to consider JHM's habitual residence from December 12, 2008, backward. According to Petitioner, once Respondent exceeded the scope of his consent to remain in the United States, the initial removal to Canada should be *recast* as a wrongful removal and the Court should then look to *that* date to establish habitual residence. Counsel's argument strains all reasonable interpretation of the Convention's literal mandate to look to the country "immediately before removal *or* retention" to determine a child's habitual residence. Hague Convention, art. 3 (emphasis added). Further, counsel has failed to provide any authority for his relation back theory.

The Convention properly instructs courts to consider a child's experience prior to the alleged breach of custody rights to determine where he was habitually resident with the consent of both parents. This inquiry provides context for the Convention's habitual

residence analysis; essentially, the Court is tasked with determining "whether a child has made a country [his] home before the date of [his] removal or retention." *Karkkainen*, 445 F.3d at 292; *see Jenkins* 569 F.3d at 553 (time period immediately preceding wrongful retention determines habitual residence, in other words, the time period immediately preceding the alleged breach of custodial rights); *Holder*, 392 F.3d at 1014 ("[T]he crux of the issue is whether the children's habitual residence was Germany immediately prior to the alleged wrongful retention."); *Feder*, 63 F.3d at 222 ("The question of [the child's] habitual residence immediately prior to the retention is the threshold issue we must first address."); *Miltiadous*, 686 F. Supp. 2d at 550 (Court determines children's habitual residence by looking at the time period immediately preceding wrongful retention); *Muhlenkamp v. Blizzard*, 521 F. Supp. 2d 1140 (E.D. Wash. 2007) (same)*; Falls v. Downie*, 871 F. Supp. 100, 102 (D. Mass. 1994) (same).  Given that the habitual residence inquiry requires courts to ascertain that country where the child has sufficiently acclimated that it might rightfully be called his "home," logic dictates that courts must look to the time period prior to the alleged breach; in other words, the time period during which the child had the consent of both parents to a reside in a particular country.  McKie's argument that Jude's wrongful retention of JHM must "relate back" to the initial removal such that the Court may only consider JHM's time in Canada for purposes of habitual residence contravenes the explicit dictate of Article 3 and runs counter to persuasive authority to the contrary.

## 2.    Habitual Residence

Next, McKie must establish that immediately before October 10, 2009, JHM's habitual residence was Canada.  If JHM's habitual residence is deemed the United States,

the Convention is inapplicable and does not compel his return as he was neither removed from the United States nor retained in another country. *Holder*, 392 F.3d at 1014.

The Convention does not specifically define the term "habitual residence," rather its meaning is purposefully open-ended to avoid formulaic and rigid application in what is invariably a "fact-intensive determination that necessarily varies with the facts of each case." *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004); *see also* Elisa Pérez–Vera, Explanatory Report, ¶ 53, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982) (hereinafter Pérez–Vera Report).[6] The Sixth Circuit has interpreted the drafters' silence in defining "habitual residence" as an indication that courts should reject a restrictive formula that equates habitual residence with technical rules applied to legal residence or common law domicile. *Jenkins*, 569 F.3d at 556; *see also Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006) ("[C]onsistent with Congress' recognition of 'the need for uniform international interpretation of the convention,' 42 U.S.C. § 11601(b)(3)(B), 'habitual residence' should bear a uniform meaning, independent of any jurisdiction's notion of domicile."). It is axiomatic, however, that–like domicile–a child can have only one habitual residence. *Friedrich*, 983 F.2d at 1401.

### a.    Habitual Residence in the Sixth Circuit

The Sixth Circuit in *Friedrich* was the first U.S. court to provide guidance in constructing the habitual residence analysis. *Id.* A German father sought return of his

---

[6]Elisa Pérez-Vera was "the official Hague Conference reporter for the Convention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10,503. "Her explanatory report is recognized by the Conference as the official history and commentary on the Convention." *Id.* The Sixth Circuit has previously concluded that the Pérez-Vera Report is an authoritative source for interpreting the Convention's provisions. *Robert v. Tesson*, 507 F.3d 981, 988 n.3 (6th Cir. 2007).

nineteen-month-old son to Germany after the child's biological mother abducted him and brought him to the United States without the father's consent. *Id.* The Court of Appeals held Germany was the country of habitual residence, looking only to the time period immediately preceding the wrongful removal. Rejecting the mother's argument that relevant to the analysis was her *intention* that the United States be their son's habitual residence, the court focused solely on the objective evidence relative to the child: he was born in Germany and had lived there exclusively before his removal. *Id.* Thus, under *Friedrich*, a court is directed to focus on "the child, not the parents, and examine past experience, not future intentions." *Id.*

The Sixth Circuit reaffirmed the propriety of disregarding parental intentions in the habitual residence analysis in *Robert v. Tesson*. 507 F.3d at 991. The court, however, refined its *Friedrich* analysis by adopting the Third Circuit's approach to look to "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder*, 63 F.3d at 224. This requires the court to focus on "whether [the child] developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places [he] encountered in a country prior to the retention date." *Karkkainen*, 445 F.3d at 292 (quoting *Whiting*, 391 F.3d at 550-51) (citations and quotations omitted). To be clear, *Tesson* only partially adopted the Third Circuit's approach to habitual residence. It embraced the concept of acclimatization, concluding it was a "refinement of *Friedrich*" 507 F.3d at 989, but again rejected inquiry into parental intent. It seems opting for the more fully articulated test in *Feder* allowed the court to more appropriately anchor the thorny factual scenario presented in *Tesson* than did the one-

dimensional approach applied in *Friedrich*.

In *Tesson*, a French father sought return of his twin boys from the United States where for a period of five years prior to their removal from France, the boys alternated between the United States and France for extended periods of time not less than six months–a factual scenario that lends itself to a more comprehensive balancing of the objective connection between the two countries prior to the twins' alleged wrongful removal to ascertain acclimatization. The Court ultimately held that boys' habitual residence was the United States. To reach its conclusion, the court cited with approval the Third Circuit's opinion in *Karkkainen*, which delineated the appropriate factors to consider in the acclimatization analysis: academic activities, social engagements, participation in sports and extracurricular activities, and meaningful connections to people and places in the new country. 507 F.3d at 996. The boys' ten-month stay in the United States prior to their final trip to France, for the court, established their habitual residence: the boys were enrolled in American kindergarten, had traveled to Yellowstone National Park with their aunt, and had developed a relationship with their maternal grandmother in Louisiana. *Id.*

To determine habitual residence under *Friedrich* and *Tesson*, then, courts look only to objective evidence that chiefly emphasizes an analysis of those countries in which a child was physically present prior to removal or retention, the length of time spent in those countries, and whether there is a degree of settled purpose in either country from the child's perspective. This approach to habitual residence is experience-driven; it focuses on the child's physical presence and the objective connections he has with a country, rather than looking to the parents' shared intent concerning where that child should live.

The straightforward facts presented in *Friedrich*, however, did not give the court "occasion for a broad pronouncement that parental intent is irrelevant to the question of habitual residence" because the objective factors were conclusive on the issue. *Mozes*, 239 F.3d at 1080. And while somewhat more problematic than the facts presented in *Friedrich*, the facts of *Tesson* allowed the court to again eschew any inquiry into shared parental intent. However, in the fifteen years between the *Friedrich* and *Tesson* decisions, a majority of sister circuits have developed and expanded the habitual residence analysis to consider the parents' mutual intent, especially when the child's own experience and intent proves inadequate. *See Nicolson v. Pappalardo*, 605 F.3d 100, 104 (1st Cir. 2010); *Barzilay v. Barzilay*, 600 F.3d 912, 918 (8th Cir. 2010); *Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009); *Koch v. Koch*, 450 F.3d 703, 717 (7th Cir. 2006); *Gitter v. Gitter*, 396 F.3d 124, 131 (2d Cir. 2005); *Ruiz v. Tenorio*, 392 F.3d 1247, 1252 (11th Cir. 2004); *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001); *Feder*, 63 F.3d 224 (3d Cir. 1995).

In *Tesson*, the Sixth Circuit expressly reserved any opinion on the issue of whether parents' shared or subjective intentions are relevant to the habitual residence inquiry of a "very young infant," recognizing that such a child "may lack the cognizance of their surroundings sufficient to become acclimatized to a particular country or to develop a sense of settled purpose." 507 F.3d at 993 n.4.[7] *Tesson* thereby acknowledged the potential relevance of parents' shared intentions when a child is too young to form any meaningful connection to a country, its inhabitants, and its locations. In essence, the court

---

[7]*See also Simcox v. Simcox*, 511 F.3d 594, 602 n.2 (6th Cir. 2007) (observing that the traditional objective standard for habitual residence–the nation where the child has remained long enough to allow acclimatization–"may not be appropriate in cases involving infants or other very young children.").

in *Tesson* implicitly recognized that *Friedrich* may prove unworkable to adequately assess habitual residence in the case of a newborn.[8]  A hypothetical illustrates the fallacy of *Friedrich's* physical presence requirement in certain situations: two U.S. citizens live in the United States.  During the woman's pregnancy, the couple decides to vacation in Ireland.  While in Ireland, the woman gives birth, and after the birth, the father decides the family should relocate and live in Ireland.  The mother disagrees and "removes" the child to the United States, and the father files a petition for return under the Convention.  Immediately prior to the child's "removal" from Ireland the child had lived his entire life there, and under *Friedrich*, that would be his habitual residence irrespective of the parents' shared intent that the trip to Ireland was merely a vacation and their actual home was the United States.  Requiring physical presence accompanied by appreciable duration in a country sufficient for acclimatization constrains the Court's analysis and can lead to what can only be assumed are unintended results.

Despite counsel's assertion to the contrary (Tr. 22-23), the facts before this Court are decidedly more nuanced than those presented in *Friedrich*.  The facts of this case present the unique question of *whether* and *when* a newborn acquires a habitual residence.  And, it requires the Court to consider what factors might be used to determine the habitual residence of a newborn whose young age prevents him from acquiring the requisite physical presence to become "firmly rooted" or to sufficiently acclimatize to a country for purposes of habitual residence.  *Holder*, 392 F.3d at 1019.

---

[8]Although the infant in *Friedrich* was also very young at nineteen months when he was removed from Germany, his age was of little relevance given that the habitual residence analysis required the court to look only to his contacts with Germany because it was the only country the child had any contact with "immediately before the removal or retention."  Hague Convention, art. 3.

### b.    Habitual Residence of a Newborn

Few courts in the United States have squarely addressed the issue of habitual residence in the case of a newborn, but those that have, have concluded that shared parental intent prior to the wrongful removal or retention is central to the determination. *See Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010); *Kijowska v. Haines*, 463 F.3d 583, 588 (7th Cir. 2006)*; Holder v. Holder*, 392 F.3d 1009, 1020-21 (9th Cir. 2004); *Delvoye v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003), *cert. denied*, 540 U.S. 967 (2003). Moreover, courts have consistently held that a newborn's place of birth does not automatically bestow upon that child a habitual residence.  *Holder*, 392 F.3d at 1020; *Delvoye*, 329 F.3d at 334 (holding that a child born in Belgium was nonetheless habitually resident in the United States because the mother "traveled to Belgium [only] to avoid the cost of the birth of the child and intended to live there only temporarily.").

Instead, courts have focused on shared parental intent or the parents' settled purpose as to the child's residence as indicative of where the child is habitually resident. *Nicolson*, 605 F.3d at 104.  "Focusing on intentions gives contour to the objective, factual circumstances surrounding the child's presence in a given location," *Gitter*, 396 F.3d at 132, particularly where the facts present a newborn or extremely young infant who lacks the relative cognizance to attach to those circumstances anything remotely approaching "settled purpose."  Analyzing the concept of shared parental intent in the habitual residence context, the Third Circuit's decision in *Feder* is instructive:

> [T]here must be a degree of settled purpose.  The purpose may be one or there may be several.  It may be specific or general.  All that the law requires is that there is a settled purpose.  That is not to say that the propositus intends to stay where he is indefinitely.   Indeed his purpose while settled may be for a limited period.  Education, business or profession, employment, health, family or merely love of the

place spring to mind as common reasons for a choice of regular abode ... All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

63 F.3d at 223 (quoting *Re Bates*, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989)). The *Feder* standard couples objective indicia of the child's acclimatization with the mutual intent of the parents respecting that child's residence. 63 F.3d at 224. Thus, the determination focuses on an analysis of the child's circumstances in the place that he is in and his parents' present, shared intentions regarding his presence there. *Id.* Parental intent is important because it provides context for the objective contacts a child has in a given country and should inform the habitual residence analysis when a child lacks the mental capacity to shape that context him or herself.

Present, shared intent, of course, is difficult to determine when parents disagree on where a child's habitual residence should be fixed. This, however, is most often the situation in cases arising under the Convention–hence, the petition for return. In these cases, "the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for return ... has already agreed to a child's taking up habitual residence where [he] is." *Mozes*, 239 F.3d at 1076.

Cases involving incongruous parental intent fall into three broad categories. In the first, a family unit manifests a settled intent to relocate to another country they intend to make their home, even if one parent voices reservation concerning the move. Usually, this circumstance will lead the court to find a change in habitual residence, in other words, an intent to abandon the country left behind. Grouped into a second category are those cases

where a child's "initial translocation" from a habitual residence is intended to be for a "specific, delimited period." *Id.* at 1077. In such cases, most courts will find no change in habitual residence. Third–and most difficult to discern–are those cases where one parent consents to the child's stay abroad for "some period of ambiguous duration." *Id.*; *Whiting v. Krassner*, 391 F.3d 540, 549 (3d Cir. 2004). In this third category of cases, the habitual residence analysis is exceedingly fact-dependent with varying results. The case before this Court initially fell into the second category, but once McKie extended the scope of his consent indefinitely to allow JHM to receive medical treatment in the United States, this case became one that appropriately falls within the third category.

### c.  JHM's Habitual Residence is the United States

Applying the *Feder* standard to the facts of this case, JHM's habitual residence was the United States immediately before his wrongful retention in October 2009. JHM's objective contacts with the United States coupled with his parents' present, shared intent that he receive treatment for an indefinite duration at Shriner's Hospital in Lexington, establishes the United States as JHM's habitual residence immediately before his retention.

In stark contrast to the infant in *Friedrich*, JHM was a mere two and a half months old when he left Canada and had only lived two and a half weeks at his father's house in Charlottetown. These contacts, standing alone, are hardly sufficient to conclude that any child has "sufficiently acclimatized" to a country for purposes of habitual residence. But, even if a court were to conclude that JHM's habitual residence at birth was Canada based on his parents' present, shared intent to remain there, JHM's habitual residence changed to the United States. JHM resided in the United States for eleven months prior to his

"wrongful" retention–five times as long as his initial stay in Canada as a newborn. JHM has lived with his maternal grandmother in Louisa since his arrival to Kentucky and began intensive orthopedic treatment in January 2009 at Shriner's in Lexington, which is ongoing. JHM's physical presence alone point the Court toward a finding that the United States is his habitual residence.

In addition to the appreciable period of time JHM spent in the United States, McKie and Jude evinced a settled purpose–after JHM's arrival in Kentucky–that he reside indefinitely in the United States to receive treatment at Shriner's for his clubfeet. (Tr. 86). Parents "need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary." *Mozes*, 239 F.3d at 1075. That is exactly what happened in this case. Jude and McKie's intent coalesced against a backdrop of developing medical information relative to their son's condition. Although Jude initially traveled to Louisa, Kentucky to visit her parents during the 2008 holiday season, the intent of the visit changed after Dr. Talwalkar agreed to treat JHM using the Ponseti method of casting and, if needed, ligature surgery. Jude and McKie previously agreed that she would meet with Dr. Talwalkar while in Kentucky to explore the possibility of receiving the Ponseti treatment for JHM's clubfeet; a treatment that was not available on Prince Edward Island at the time JHM was born. (Tr. 85). By his own admission, McKie and Jude began discussing the possibility of the Ponseti method in June prior to JHM's birth. (Tr. 66-67). Once Dr. Talwalkar agreed to administer the treatment, both parents consented with the knowledge that their son's treatment did not have a specific end date. (Tr. 87). McKie testified that because "Shriner's [was] funding and paying for [JHM's] treatment... [he] didn't see the need to immediately bring him back to Canada." (Tr. 74).

Parental intent, moreover, need not be "expressly declared, if it is manifest from one's actions." *Mozes*, 239 F.3d at 1075. Although McKie adamantly denied any intention to move to the United States permanently or to allow JHM to reside in the United States permanently, he consented to medical treatment in the United States not otherwise available on Prince Edward Island after his son was subject to an unsuccessful casting regimen in Canada.[9] McKie's consent has been necessary for all of JHM's surgeries, including his latest surgery on December 8, 2010. (Tr. 132). The uncontradicted hearing evidence indicates that each time JHM has surgery, Shriner's places a call to McKie in Canada to allow him an opportunity to ask questions, for which the doctors at Shriner's provide answers. (Tr. 132). By implication, his continued consent to JHM's surgery and treatment indicates his shared, present intention with Jude that their son receive the Ponseti method treatment in the United States. McKie and Jude's settled purpose, thus, coalesced over time as they garnered more information about the appropriate direction for their son's treatment and as the Ponseti treatment proved beneficial. Shriner's is currently funding JHM's treatment in Lexington, with the intended goal that he might at some point walk independently and without orthopedic intervention. (Doc. # 16, Ex. 4). McKie's express testimony that he agreed and consented to JHM's Ponseti treatment at Shriner's in Lexington exhibits an intent that JHM habitually reside in the United States–even if for

_____

[9]It was Jude's hearing testimony that once she became pregnant she intended to give birth in her home state of Kentucky near her family, a desire that was thwarted when she was admitted for her emergency C-section. (Tr. 79). She further asserted that she and McKie agreed they would reside permanently in the United States after JHM's birth; a fact McKie vehemently contested. (Tr. 69-70, 79). The Court does not find Jude's hearing testimony credible on this point. No evidence was produced to establish such an agreement, and it is clear from the extrinsic evidence produced, Jude originally intended to return to Canada at some undetermined date in the future. (Doc. # 37, Ex. A). However, the facts dictate a finding that both parents did agree that JHM would obtain medical treatment for an indefinite duration in the United States; a treatment that was not otherwise available on Prince Edward Island at the time of JHM's birth. (Tr. 37, 85).

a limited, but appreciable period of an indefinite duration–for the purpose of receiving treatment. "It is entirely natural and foreseeable that, if a child goes to live with a parent in that parent's native land on an open-ended basis, the child will soon begin to lose habitual ties to any prior residence. A parent who agrees to such an arrangement without any clear limitations may well be held to have accepted this eventuality." *Mozes*, 239 F.3d at 1082.

In his supplemental briefing, McKie argues *Blanc v. Morgan*, 721 F. Supp. 2d 749 (W.D. Tenn. 2010), a case where the district court granted petition for return, is "practically indistinguishable from" the facts presented here. In that case, a French father sought return of his four-year-old daughter to France after her mother brought her to the United States for a purported visit using round-trip tickets. *Id.* at 755. While in the United States, *the mother* sought treatment for carcinoma cancer, a diagnosis she received while in France. *Id.* at 755-56. A few months thereafter, the father visited his daughter in the United States, at which time it became clear to him that the mother had no intention of returning to France. *Id.* at 756. After this visit, he filed his petition for return. The court held that the mother's unilateral decision to remain in the United States did not effectuate a change in the daughter's habitual residence from France to the United States. The daughter had lived her entire life (i.e. three years) in France prior to her wrongful retention, and her objective connection with France coupled with her father's lack of consent that she reside in the United States for any length of time guided the court's decision to grant his petition. *Id.* at 761.

*Blanc* stands in stark contrast to the unique facts presented in this case. Most significant, in the Court's view, is the treatment-seeking nature of Jude's trip to Kentucky

24

to obtain medical care for her son otherwise unavailable on Prince Edward Island. Jude did not travel to Kentucky merely for a visit with her family, but also with a settled purpose to seek necessary medical treatment offered in the United States. Unlike the father in *Blanc*, McKie was made aware of Jude's intention not only to visit her parents in Kentucky, but to explore the Ponseti treatment option *prior to her departure*. After an unsuccessful casting regimen in Canada and a referral to a second doctor who recommended only invasive surgery, McKie and Jude agreed that an opinion–and possible treatment if available–from a physician administering the Ponseti method was advisable. She did not hide from McKie her intent to seek more long-term treatment for JHM at Shriner's. Jude purchased a one-way ticket and kept McKie abreast of all medical developments relative to JHM's care, which in most cases required his permission. Indeed, in his own affidavit McKie admits that he felt it was in JHM's "best interest" to obtain treatment in the United States given that "the wait list was much shorter in Kentucky than in Canada." (Doc. # 1, Ex. B). Thus, it is evident McKie was fully aware of and consented to Jude seeking treatment in the United States, consent which has continued even *after* McKie alleges JHM was wrongfully retained in the United States.

The Court does not find credible McKie's assertion that he agreed only to allow JHM to begin treatment in the United States but that treatment would conclude in Canada. (Tr. 48). Neither party produced evidence that JHM's Ponseti treatment would effectively continue in Canada. The only testimony relative to the issue was a tangential reference to a conversation McKie had with a "Dr. Shay" a day before the hearing. Dr. Shay stated his preferred method of treatment was corrective surgery, but that McKie could further "confer" with doctors in Canada that were administering treatment akin to the Ponseti

25

method. (Tr. 48-49). This testimony is insufficient to establish that the agreement between McKie and Jude was to begin treatment in the United States and finish in Canada. The fact remains, the two Canadian doctors who either treated or provided counsel for JHM's clubfoot condition were either not familiar with the Ponseti method or regarded it as junk science. The Court, therefore, finds credible Jude's hearing testimony that in seeking the Ponseti method of treatment at Shriner's in Lexington, she and McKie had agreed to a treatment regimen not immediately available on Prince Edward Island. (Tr. 37, 85). McKie cannot now negate the operative nature of his consent to medical treatment in the United States simply because it stands to support a result he seeks to avoid. JHM's habitual residence is rightfully the United States, a country in which he has spent over two years receiving medical treatment, bonding with his grandparents, and generally acclimating to his environment, especially given that it is questionable whether he ever even acquired any tie to Canada that could properly be construed as "habitual" in the first instance.[10]

### d. Policy Underlying Hague Convention: Deterring Abduction

In crafting a workable approach to habitual residence for newborns, the Court is not unmindful of the Convention's overarching aim to deter international child abduction. To preserve the Convention's objective, the applicable legal standard must not render meaningless the Convention's deterrent function. To this end, courts have rejected unilateral intent changes subsequent to a child's removal. *See Delvoye*, 329 F.3d at 334; *In re Morris*, 55 F. Supp. 2d 1156, 1163 (D. Colo. 1999). For example, in *Delvoye v. Lee*,

---

[10] *See Kijowska*, 463 F.3d at 587 ("When [a child] was taken by her mother from the United States to Poland at the age of two months, she could not be said to have acquired a 'habitual' residence in the United States ... her brief sojourn in the United States as an infant hardly warranted an inference that she had obtained a residence separate from that of her mother.").

a mother and father living in the United States decided it would be best for their child to be born in Belgium to avoid the costs of childbirth in the United States. The mother was a United States citizen and the father was a native of Belgium. The two traveled to Belgium for their son's birth with the intent to return to the United States. While in Belgium, the couple's relationship deteriorated, and the father decided he wanted to permanently remain in his native country. The Third Circuit disallowed the father's subsequent and unilateral shift in intent to change the son's habitual residence to Belgium given the lack of mutual agreement between the parents. *Id.*

This Court finds persuasive, however, the Ninth Circuit's warning that a bright line rule, even if it furthers the policy of discouraging child abductions, must be "carefully qualified if it [is] not to lead to absurd results." *Mozes*, 239 F.3d at 1081 (quoting E.M. Clive, *The Concept of Habitual Residence*, 1997 Jurid. Rev. 137, 145.). *Mozes* advocated that even where there is no settled purpose on the part of parents, courts should find a change in habitual residence if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." *Id.* (quoting *Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.)). In the case where a child is in a country over the objection of one parent, the question is not merely whether there is evidence of some minimal degree of settled purpose, but:

> whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child "out of the family and social environment in which its life has developed." Pérez-Vera Report at 1069.

*Mozes*, 239 F.3d at 1081. Accordingly, even if the Court were to find credible McKie's testimony that he made clear his intent that the treatment continue in Canada, JHM has

now been in the United States for over two years, spending but only slightly more than two months in Canada. JHM's overwhelming and significant connection with the United States–intensive medical treatment, a close relationship with his maternal grandmother, established friendships at a five-day a week toddler program–make clear that the United States is properly JHM's "home."

      e.      **Under *Friedrich*, JHM's Habitual Residence is the United States**

An alternative, albeit less convincing, basis exists for finding that JHM's habitual residence is the United States. Assuming the Sixth Circuit were to continue to adopt the seemingly hard-line *Friedrich* analysis even in the case of a newborn child and look solely to physical presence and acclimatization prior to wrongful retention, JHM's habitual residence would still be the United States. Prior to his wrongful retention in October 2009, JHM was physically present in Canada for approximately two months and physically present in the United States for approximately eleven months. While in Canada, JHM spent his first fifty-six days in the neonatal ICU at Queen Elizabeth Hospital and only two and a half weeks at his father's house in Charlottetown prior to leaving for the United States. Although he underwent some treatment in Canada, Dr. Stewart's casting regimen was unsuccessful and both parents agreed that Nova Scotia surgeon Dr. Lahey's invasive surgical approach was not what they desired for their son. Accordingly, before leaving for the United States, McKie and Jude agreed that she would seek treatment for JHM at Shriner's Hospital in Lexington, though, neither of them knew at the time whether the Ponseti method would be effective. However, once underway with seemingly effective results, JHM's remained in the United States to receive the Ponseti method treatment at Shriner's.

Since his arrival in Kentucky, JHM has lived with his mother and maternal grandmother, with whom he is now close. He attends Little Luvs Learning Program in Kentucky five days a week to practice his social skills, a program he started after doctors observed JHM was showing signs of autism. (Tr. 111). Through this program, JHM has developed several friendships. JHM is also involved in the Kentucky Sees Program and First Steps Early Intervention Program to adequately deal with his developmental disabilities. (Tr. 92). JHM has now been in the United States for over two years and continues to receive treatment at Shriner's on a regular basis. Most recently, he underwent ligature lengthening surgery on December 8, 2010. (Tr. 93). Under *Friedrich*, JHM's physical presence and acclimatization for eleven months in the United States prior to his retention becoming wrongful warrants a finding that JHM was habitually resident in the United States immediately preceding his wrongful retention.

One final matter deserves brief comment. Jude asserted three of four affirmative defenses in her response brief to McKie's Petition for Return. (Doc. # 25). Specifically, Jude argued that JHM would be subject to grave risk of physical harm if uprooted and returned to Canada given his rigorous treatment regimen at Shriner's Hospital, as well as psychological harm given his developmental delays, which dictate stability and early intervention for effective treatment. (Doc. # 25 at 5-6). She also argues that McKie failed to file for return within one year from the time JHM was removed or retained in the United States, and lastly, that McKie was not exercising custodial rights at the time of wrongful removal as she was primary caretaker and he provided no assistance in the care of their minor child. Because Petitioner failed to establish his prima facie case for return, the Court need not address these affirmative defenses.

### III.  CONCLUSION

Petitioner has failed to establish that JHM was habitually resident in Canada immediately before his wrongful retention and, thus, fails to make out a prima facie case for return.  Hague Convention, art. 3.  Accordingly, for the reasons set forth herein, **IT IS ORDERED** as follows:

(1)     Petitioner's Petition for Return of Child (Doc. # 1) is hereby **DISMISSED**;

(2)     Petitioner's request for attorney's fees under 42 U.S.C. § 11607 (Doc. # 1, ¶ d) is hereby **DENIED**;

(3)     This matter is hereby stricken from the Court's docket..

This 7th day of January, 2011.



Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\Opinions\Ashland\0-10-103-MOO Petition for Return of Child.wpd